This is the first time that the Fourth Circuit has sat at the University of Baltimore Law School and we're very happy to be here. And we appreciate counsel coming here because I know that sometimes you may feel uncomfortable in the law school, but it's very helpful to the students to see what actually happens. This is a real case, not a moot court, so we ask you to be silent and listen carefully. Counsel, we're ready in our first case, number 14, 1442. Mr. Smith. May it please the Court. My name is Spencer Smith and I represent Appellant Renee Pryor who requests that the Fourth Circuit reverse and remand the District Court's decision to grant summary judgment as to the plaintiff's hostile work environment claim. The decision in this case was made by the District Court on April 16, 2014. And that date is very significant because it was 13 days before the Fourth Circuit decided the case of Freeman. In that case, the Court decided whether or not an employer could be liable for hostile work environment when a customer harassed an employee. And the Fourth Circuit gave direction as to what the Court should consider. I think that the consideration the Court's made in the Freeman case are going to be very relevant to my discussion this morning. Ms. Pryor worked for United for several decades as a flight attendant. And she worked her way up to a purser. Now Ms. Pryor worked her way up to that position. While working at Dulles Airport, racial hostility towards African-Americans began to escalate. And it started with allegations that the African-American flight attendants working out of Dulles and working in Kuwait were prostitutes. And there were allegations that these flight attendants by their co-workers were moonlighting as prostitutes. The district manager, Ms. Panos, it's undisputed, became aware of these incidents. The base manager, Mary Kay Panos, became aware of these incidents. It's undisputed. This escalated to a posting being put in the flight attendant break room for an apartment. On two occasions, there was a posting put in the break room that said niggers need not apply. Did Ms. Pryor know about those? Ms. Pryor testified, Your Honor, that she did know about those. And that would be... At the time and complained about them? She did not complain about them, but she was made aware of them. And she testified at 1183, 1184. I thought that your case rested primarily, if not exclusively, on the items that were found in her locker. No. Your Honor, it's going to... When we look at what events would trigger the employer to take action, okay? So what should the employer then, if you want to talk about these earlier incidents in which she did not complain, as I understand. Correct. So how is the employer to take action in response to her improper environment if she never complains? I think the Supreme Court law is pretty clear on that. I don't think the Supreme Court law requires a complaint. The issue is whether or not the employer had notice. And here, it is clear the employer had notice. Regardless of whether or not... The employer's testimony was that they took them down, they called the number, they tried to trace it, they couldn't find anything. There were two fairly close together incidents, and they're gone. And that's why I thought that what you were doing, that was background, that was interesting, but you're talking about these very much more serious notes that were found in her locker. Is that not right? That is correct, Your Honor. But I think there's a nuance that we have to focus on here. I see. And that is whether or not the inaction of the employer when it came to the prostitution allegations and the offensive posting in the break room, whether or not those inactions emboldened the anonymous harassers... Is there any indication in this record that they are from the same source? No. This is clearly... All of these incidents involved anonymous harassment. And that is what is very interesting about this case. Well, what should the employer have done? They should have followed... What is the bare minimum that would have passed legal scrutiny? Your Honor, the bare minimum would be to follow their own policies. And there's no law that you have to follow your policy. Well, one of the... There is a law that the policy gives you, in certain instances, some sort of affirmative defense. But there is no law that says you have to follow that policy, that we would be defeating the purpose of having employers have policies if we said that every time that they didn't follow letter for letter their own policy, that they violated the law. So that can't be the bare minimum. Your Honor, I want to be very careful here. I'm not saying that that would establish as a matter of law that the employer is liable for hostile... I'm asking you in this instance, on these facts, what was the bare minimum that the employer could have done that would have sat... Would have passed muster? That question cannot be asked at this particular proceeding because we're at summary judgment. But you must have a position. My position, Your Honor, is there was a policy in place that allowed a delegated body to investigate complaints of harassment. That was the employee service center. But we, on summary judgment, are supposed to test whether the employer's response was reasonable. And if you're not even coming... In other words, your position is, so if we should find that, no, as a matter of law, the employer didn't have to follow the employer's policy, then the employer wins. Is that what you're saying to me? No, Your Honor. Well, then what is it that the employer had to do? Your Honor, that's a question of fact for the jury to decide. That's not for... It's not for the panel or for any judge to decide. We're here to decide whether or not we've presented facts that would allow a jury to make that determination. And what we have here is the harassment continued and it got more severe. It escalates. And not only does it go to the plaintiff where she gets a nigger hunting license in her mailbox with a picture of a female hanging from a tree. She complains about that in January of 2011. October of 2011, another nigger hunting license is placed, not only in the plaintiff's mailbox, but 20 of her other co-workers' mailbox. So the steps... Can I ask you a second about that second incident? Sure. It was my understanding from your brief that you had, on appeal, acknowledged, maybe all but acknowledged, that the employer's response to that second incident, putting in the cameras and so on, was satisfactory, was sufficient. That is correct, Your Honor. So we're now looking at the first incident. I think we need to look at all the incidents, the totality of the circumstances. And we need to ask, and the court needs to ask themselves, number one, has the appellant produced genuine issues of material fact that would allow the to say either the employer's response was reasonable or not. And when we look at the prostitution allegations, the policies at United Airlines stated that if a supervisor, a local supervisor, becomes aware of harassing conduct, there is a procedure to follow. That is to escalate it to the employee service center so they can do an investigation. It's undisputed that did not happen with the prostitution allegations. Mr. Smith. Yes, Your Honor. Can I ask you a question? Yes. As to the rumors, who, a rumor is a rumor, but how are these rumors conveyed and to whom? Your Honor, they were conveyed to the flight attendants at large. So I walked up to them and say, I heard that black flight attendants are moonlighting as prostitutes in the other country. That is correct. And these people didn't come and say, well, this person told me that and spread the rumor. That didn't happen, though, in this case. And Your Honor, in the record, even Ms. Denise Robinson Palmer says, you know, I don't know a lot of the people that I work with. This is a transient workforce. There's over 2,600 flight attendants assigned to Dulles. They don't all know each other's names. And the African-American flight attendants informed not only the base manager but the director about these rumors. Your Honor, to have a woman in the workforce traveling and working and to be accused of being a prostitute, at a bare minimum, if these type of allegations are being made and disseminated amongst the workforce, an investigation could have been done to figure out who was making these rumors and to stop it. The issue we have here is whether or not the lack of action emboldened the anonymous harassers to feel that they can get away with not only making up rumors. It started with rumors. Then it escalates to niggers may not apply for apartments. And then it escalates to death threats. Maybe another way to get to this, because I hear your position, but it's not very helpful to me in deciding the case, is if you could tell me what you think your strongest precedent in your favor is. Your Honor, the Fourth Circuit has not had the opportunity to visit the issue of anonymous threats in the workplace. Yeah, we have. But none of those cases are very helpful to you. But go ahead. Your Honor, and what we did was we cited some out-of-circuit authority. Just tell me your best case. And Your Honor, that would be the Tadme case versus Union Pacific out of the Tenth Circuit. And there, Your Honor, and this is the issue that you and I are having now, is the court there gave some instruction and said, although there may be difficulties with anonymous acts of harassment, those difficulties at most present factual questions about the reasonableness of the employer's response. You know, I took that in your reply brief. And when I read your reply brief, I went and got the book, you know, the books out of the bookshelves. You people aren't familiar with that, but they're on the bookshelves. Your Honor, I've never done that. I went and looked at it out of the bookshelf. And the problem, it seems to me, for you in that case is that there was so much more discriminatory activity going on. I mean, it was just a sea. And Your Honor, and that's... And you would recognize that. Your Honor, I would definitely recognize that. And Your Honor, I think what we have, what we need direction from the court is, and what Your Honor is doing today is saying, you know, what facts do you have? What are the... I'm saying what is a reasonable response to what was done here? And that's what the Supreme Court has said. And that question has to... The employer has to act reasonably. The Supreme Court doesn't say the employer has to follow regulations that the employer creates. I agree with you, Your Honor, but that question is a question of fact for the jury to decide. And as a... No, we all, whether or not, if you meet a certain threshold, it is. Correct. And so the thresh... But, for example, in the third, in the second incident, you've conceded that a matter, as a matter of law, you're not pursuing it, that the employer acted reasonably. Correct. But that's exactly why he should have put up the camera after the first incident. Isn't that your point? Yes, Your Honor. If the employer had waited until a third incident before putting up the camera, your case would be better, but it would still rest on the same legal foundation, would it not? Yes, Your Honor. Well, the employer's explanation for not putting up the camera, so that that would be, is that your submission? That's the only thing that the employer could have done that would have been a reasonable response. Investigate the matter. No, no, no, not investigate, because the employer did investigate. Your Honor, and that's where... Putting up the camera was the only thing the employer could have done. I think speaking to the co-workers, speaking to the workforce, speaking to those who had access to this secure area, at a bare minimum, that would have been enough. I don't even, I think the cameras was, that would be too much to even ask, but it did stop the conduct. But at a bare minimum, just speaking to the witnesses and saying, and putting a notice out there, we're not going to tolerate this. Well, of course, the employer did ultimately do all that. After two months, Your Honor, and again, if we have a situation where a lot of the cases that are cited by both parties in this case deal with the immediacy of their response to the remedial action, and the majority of these cases, whether we have a noose in the workplace or allegations of harassment, we have an immediate contact with the workforce in general. We do not have that at the case at bar. We just don't have that. Do we have any doubt in this case that the perpetrator of the horrible death threats was a co-employee? There's no doubt. There's no dispute. Did anybody else have access to that secure area other than someone working for United? No one else had access. Or with United's authority? No one else had access. Does the record tell us that? The record does not tell us that. Like there could be, does United outsource janitorial work? Your Honor, that would, and I'm not familiar with that. Well, that would be on United's authority. Correct. But not an United employee. Correct. But not an employee, but somebody, in other words, nobody gets in there without committing a criminal act in the absence of United's authority to be in there. Correct, and I think, Your Honor, and that becomes very important to look at the analysis of Freeman, where we had a customer, someone who was not even an employee of the defendant employer, where the court imputed liability on the employer because they had knowledge of his conduct. And when we look at the Freeman case, his actions did not arise to the level of making death threats. He used the N-word when discussing things. He referred to women as bitches. But he never escalated his conduct to death threats. In this particular case... Mr. Smith, your time has expired. You can finish your sentence. Okay. In this particular case, we do have acts that arise to the level of death threats, and I think that's where we take this matter into a different realm, and I'll reserve the rest of my comments for rebuttal. Thank you, Your Honor. Good morning. May it please the Court. My name's Jody Boquist, and I'm appearing on behalf of United Airlines. At the outset, I'd like to say that the discovery record in this case confirms that United, at all times, was committed to maintaining a workplace free of harassment and discrimination. In each incident that's been raised by the plaintiff in the court below and in the record, United did, in fact, investigate. Unfortunately, this was anonymous harassment. They were not able to identify the perpetrators, but in each incident, United took appropriate, reasonable actions that were calculated to end the harassment. And, in fact, the harassment did end. Each measure was taken was more progressive, and ultimately, since 2011, there have never been any other incidents of racial harassment, anonymous racial harassment, in the workplace. Am I correct that the only reasonable inference from the record is that the death threats were placed where they were found by someone either employed by United or who had access to that area with United's authority? Judge, I think the record is unclear on that, but certainly United has not taken the position that it wasn't responsible for what happened. What's the lack of clarity in that regard? I don't know that the discovery record was developed as to exactly who had access. It's my understanding, Judge, that this is a secure area. Obviously, it's at Dulles Airport, and that only individuals authorized to enter would be able to get in. So would a contrary inference be reasonable? In this case, I don't believe so, simply because there is, but there certainly wasn't extensive discussion in the record as to who had access. Would you have to infer a criminal trespass at a minimum to draw a reasonable inference that the person who placed these death threats was not a person who had access through the authority of United? Yes, I think that's reasonable. And I will say, just to clarify some points for the record, Your Honors, I know you've reviewed the briefs and the discovery record, but I'd like to highlight a few points. That at most, taking plaintiff's allegations is true for purposes of summary judgment, as we must. There were four alleged incidents, and if you include the prostitution allegations, roughly five, over nine years. These were scattered, isolated incidents of anonymous harassment. With regard to the prostitution rumors, the first incident that Ms. Pryor testified about occurred back in, I believe, 1990, she said. And she did say it was in San Francisco. It was a different base. She spoke with a supervisor. She didn't complain. She just said, hey, someone said that flight attendants flying to Kuwait have been prostituting themselves. Do you know anything about it? To that effect. Again, in 2009, she claimed someone said this to her. She never reported it to Dulles Management. Regardless of the fact, the record does reflect that Dulles Management did get wind of these rumors. And no one was identified as the perpetrator of spreading the rumors. Nevertheless, United Management attempted to identify whether or not there was any truthfulness to the rumors, whether anyone was involved. There were calls made to the Kuwait base. No one knew anything about it. They called the hotel, where one might expect there might be some activity of that kind. If it were really true, the hotel had not reported any issues. And there's no evidence in the record that those rumors ever continued after 2009. There was very little else that could be done. With regard to the, and by the way, Ms. Pryor was not flying to Kuwait. She doesn't claim she was the subject of those rumors. My understanding of the plaintiff's position regarding the prostitution rumors is that the plaintiffs used those facts for a fairly limited purpose, limited though important purpose, which is to put United on notice that something's going on at Dulles. Something's going on. And in fact, as you say, if something was going on in 1990 regarding rumors and so forth about black women in the workplace, and the rumors are still swirling about eight or nine years later, I think the plaintiff's submission is a reasonable employer knows that something's going on here. And it's for that limited though important purpose. I would submit that it's not a reasonable inference that these are any way, shape, or form somehow of the same type or nature. Were they swirling around in Dulles? They got wind of it in 2009 that somehow there was. But again, I don't see how they can reasonably be seen as connected to the tags that happened later. They're not even the same type of allegation or the same type of harassment. But regardless, the bottom line is United did take action and it did end. And then when the bulletin board postings occurred, there were two identical ones that showed up in the employee lounge. Denise Robinson Palmer, who was also African American, is the one that found them. She took them down. She called the apartment complex that was listed in the posting and asked who posted it. Tried to identify who the perpetrator was. The woman on the other end of the phone identified that she was also African American. She was offended. She would never do such a thing. There was no evidence as to who could have done it. But Denise Robinson Palmer took the actions of monitoring the bulletin board repeatedly and it never happened again. And what was the temporal? As I understand, Judge, the record reflects that it was in fall of 2010. And then the death threats were? Yeah, the first tag showed up or the first threat, the hunting tag depiction showed up and it was a single one in Ms. Pryor's mailbox in January 2011. When was that? January 2011, January 8th, Judge. And when was the apartment posted? It was in fall of 2010. Fall of 2010, so four, five, six, seven months later. Correct, Judge. And when that happened, contrary to the allegations made by plaintiffs, there was immediate action taken. Well, I think that this is the most difficult part of your case. And I think that, although they haven't said it exactly this way, I think that their best argument is that your response was not appropriately quick. Well, Judge, the record reflects that the day it happened, the supervisor contacted base management. It happened on a Saturday, I believe evening, at some point on a Saturday. Base management was contacted immediately and notified the incident. The supervisor immediately asked Ms. Pryor, do you know who could have done this? She had no suspects. And how did he treat it? He said he thought it was a joke. Well, I think in context... Is it not for this record? Didn't he say he thought it was a joke? I think he said he didn't think it was funny. And I believe... I may be confusing now some deposition testimony, but for purposes of summary judgment, yes, I think that the record reflects that Ms. Pryor said he said something to the effect of that it was a joke. Exactly, that's what the record is. But the first thing in your policy says this. First, take it seriously. Correct. That wasn't done. That's the first point. But Judge, I think the fair inference when you look at the total record is he did take it seriously. It's undisputed he contacted base management that evening to notify base management of the incident. He didn't just ignore it or sweep it under the rug. The fair inference is that he did take it seriously. He didn't take it to the ESC. He didn't take it to the ESC. And this is what I'd like to point out. And even Ms. Pryor said she expected corporate security to deal with this. There has been much made about the fact that whether United called, the managers called the ESC versus calling corporate security. This is a big company. The reality is a lot of employers aren't big enough to have a separate corporate security department. But United does for obviously reasons. As soon as this happened, excuse me, base management contacted corporate security because of the nature of the document, which did include threats. I submit that there's nothing unreasonable about United taking that path. And in Ali's honor of human resources, testified that that is one path under United policies you can take. Certainly there was a racial component, but there was also this threatening component. It's not unreasonable that they contacted corporate security. And I would say in all fairness, because of the safety issues, it's more than appropriate that they did that. That was calculated, first of all, to try to figure out what they could do to identify a suspect. And unfortunately, there was little they could find. How about this? Could United have asked for an affidavit, not a lie detector. Forget that. Could United have asked for an affidavit from each person with access to that secure space attesting to two questions. Did you leave these offensive statements and second, do you have any information as to who might have done it? Two questions, questionnaire, supported by affidavits from each person who had access to that space. I would submit that that wouldn't be reasonable nor would it be calculated, if I may, nor calculated to end the harassment. There was no way to tell when that document was left. As counsel correctly pointed out, this is a 2600 flight attendant workforce. They come in and out all the time. There was no way to tell when it was left. Well, we know when it was found. Or when it was found. They knew when it was found but they didn't know when it was actually left. It could have been left at any time. She was going out. She was going out to Moscow. And I believe the record reflects that the last time she had been in the airport had been at least a week earlier and it's unclear from the record if she checked her mailbox at that time. The fact of the matter is the time that at that point in time United was pretty pragmatic I think about looking at okay, we don't know who did it. There's no way to tell who did it, when they did it. And it's difficult to imagine that somebody would admit they have done it through an affidavit. But if I may, the reality is Why is that difficult? What's that? Why is that difficult? That somebody would admit that they left a racist note Or that they have information about who might have done it. Well, I will say that When the DNA stuff came on the scene 10 years ago a number of jurisdictions routinely rounded up certain demographics for the purpose of requesting voluntary DNA submissions. And what they did was they said, we're going to focus our investigation on them. You know, you could criticize that technique but it has other applications. But if I may judge I will say that under the circumstances first of all United did act I think pragmatically in focusing on monitoring the mailbox United did in fact end up sending a must-read email sometime later. There is still no evidence to this day that anyone witnessed it. That anyone had any information. For me the more troubling thing here is United did all these things they had all these employees talk to each other and then as I read the record by the end of January things stopped. Case is closed. Then she reports at some point the case is closed then she reports to the police that ignites a new wave of stuff and finally in March the end of 25th of March they post the notice. Well judge if I may I think it's a little different than what I think I might have the time a little wrong but you would agree with me that there was this initial push talking to each other and then United thought they could do nothing they closed the case and the plaintiff went to the police. Actually I don't think first of all that United thought they needed to do nothing they were monitoring the mailboxes there were no further incidents and they maintained contact with corporate security through February 4th judge and then on the heels of that as I understand it  and if I understand it Ms. Pryor was upset that she hadn't heard back from anyone as to what was being done. Which is perfectly understandable. Perhaps not required by the discrimination law but perfectly understandable. Right and so as I understand it that caused Ms. Pryor not to call the police initially but to call the ESC another avenue for her to seek relief she contacted them on February 16th on February 17th Allie Zahner was involved on February 18th then Allie Zahner attempted to do further investigation by contacting Ms. Pryor she said she didn't have time to talk it took Allie Zahner a full two weeks to be able to speak No no that's true what I'm trying to get at is that the incident took place in January and United didn't post a sign which is what the plaintiff said in deposition she thought would be appropriate until March 25th Judge is that an adequate response an adequate prompt response Judge in the totality of the circumstances of this case I believe it is because first of all there was there was more than just the must read email that was sent out they were monitoring the mailboxes supervisors were notified nothing else was happening and never did for another nine months during that time when it was escalated to human resources further investigation was conducted further interviews were conducted and at the same time after that Ms. Pryor also involved the police there was a lot of activity around that and Ms. Zahner was attempting to complete her investigation and I think it's reasonable that they did further investigation before they decided that that was the appropriate action they could take because they still couldn't identify suspect let me try to put it another way if Ms. Pryor had not escalated the if she hadn't gone to the second source of United employees the police would never have been involved nothing more would have happened if United wasn't escalating it that way if I may submit there's no evidence that would have made a difference or that would be material it never happened again until October of 2011 well that's a very interesting question so is your submission really United didn't have to do anything because nothing ever happened again absolutely not Judge United did take action but that's sort of what you're saying to me it doesn't make any difference whether United continued it or not or whether she had to get the investigation going again because nothing happened anyway there's no evidence that they stopped monitoring the mailboxes and that was effective there's no evidence that ever stopped and so I submit Judge that this wasn't a situation where United thought it didn't have to do anything certainly when Ms. Prior contacted  they took additional action but it's not as if they ignored the situation and I think Judge in some of your decisions you've correctly pointed out in the Fourth Circuit a particular remedial response and it need not be the most certainly effective this was in your opinion your concurrence in the Zurch's case but certainly maybe there could have been something more effective but that isn't the standard in hindsight in the totality of the circumstances United's actions were reasonable they were calculated at the end of the harassment when United sent out some communiques to the employees about soliciting information about this why was it so cryptic it didn't even tell them what the allegation was Judge thank you for asking that and that point was raised below if United put any detail as to what this incident was to a workforce of 2600 flight attendants it would be actually spreading the harassment why because you got a lot of people who want to send notes to say niggas well first of all or be inspired to do so it could be it could inspire copycats sure could and certainly giving any details to what the content was they wouldn't repeat that that would only spread the hostile work environment what United did was appropriately say there was offensive material put in the mailbox it didn't even mention that it was racial racially motivated well if it was racial or sexual regardless it would have been inappropriate and I don't know that that matters but because it doesn't matter when you have a workforce and that's what I think that appellants are talking about the whole instance of the rumors spreading over a period of almost a decade you have that environment going on you have the department type thing it makes a difference that this was racially motivated doesn't it in your environment United obviously has some problems going on and you're saying you're not responsible for them but you have rumors persisting that long and so particularized to black women you don't think it made a difference that this was racially motivated look like United was more interested maybe in their saving face than it was maybe finding absolutely not judge why not why not because again I think what the company was concerned about was making sure that people noticed that there was something inappropriate going into mailboxes I don't believe that they needed to be more specific because what the point was is any inappropriate materials going into the mailboxes should be monitored and that everybody should keep an eye out for it and the reality is on the prostitution rumors this wasn't constant rumors there are two incidents that she reported that she said there's no evidence in the record you just told the court that the command in Dulles found out about them in 2009 but there's no if I may and perhaps I misunderstood but I don't think there's any record that there's constant rumors from 1990 to 2009 there was one incident that she reported in 1990 and then the other incidents occurred in 2009 that's what I was trying to address Judge but who received those rumors in your command in Dulles there were two people that reported in the record the record reflects that two people reported those hearing those rumors to Denise Robinson Palmer in 2009 and then you investigated those whether or not that was in response to their direct response or if it was base management hearing about it the record reflects that somehow base management heard about it it's unclear if it was from those two individuals or if it was someone else but they did take efforts to investigate and you know as I said there was little to go on they weren't able to verify no one was identified as the person the two individuals that reported to Denise Robinson Palmer did not identify the people that were making the rumors so there was no way to but you help me with this this is the problem I have with the district court's ruling and writing the record the basis of the ruling was that first of all this did constitute the first three prongs of hostile work environment but the last prong as to imputing it the reason it was not found in the sole reason was that there's no evidence that they investigated differently or done something different that they would have disclosed who the culprit was do you believe that that is the standard that you have to that it's all based upon whether or not you would find the culprit that's the metric do you think that's the law no judge the law is whether the actions whether United responded in a manner a reasonable manner that was calculated to end the harassment so you agree that that standard is not correct in the district court's ruling I didn't read the opinion that way because I do I read it what it said if I may I think she cited the correct standard and that in the end that certainly is one factor that is considered in determining whether to impute a liability is whether or not the harassment ultimately ceases I'm sorry I see my time is up your time is up I just wanted to check just one factual thing both you and your colleague have said there are 2500 flight attendants based in is that right correct are there other does this count like mechanics are they no it's just flight attendants that are based in this area who else they could be commuting from anywhere in the country no no no those are flight attendants are there other United employees that have access in that in the domicile there judge that is unclear from the record and I would assume that is the case but I couldn't speak to that directly thank you thank you Mr. Smith you have a bit of time left for rebuttal we keep going back to the importance of reporting this up to the employee service center facts of this case make the employee service center very important and that's because there is no local human resources in Dulles they are all in Chicago and so when a supervisor becomes aware of harassment it's incumbent upon that supervisor to communicate with Chicago so Chicago can investigate the harassment Mr. Smith tell us why answer this directly since you're on rebuttal and that's what rebuttal is for why was sending it to security inadequate I want to quote the 30B6 deposition we took the 30B6 deposition and they designated Ali Zahner who is in charge of human resources in Chicago and Ms. Zahner stated that you would report an issue to corporate security if it did not involve harassment and that is at JA1542 I think that we can all agree that they didn't follow the letter but that's not what Judge Gregory I don't think I think he meant legally why that wasn't sufficient because you would agree if no matter who they reported to if it stopped instantly and it never started again it was sufficient that is correct so there has to be something more than they didn't follow the rule to who they should report it and as I stated in my opening remarks I believe in speaking to the witnesses letting the staff there whether it's fight attendants or whoever had access to this area that there is zero tolerance for harassment letting the staff know that we are aware of racial issues going on at Dulles and we have a zero tolerance policy and we will take action if it continues that does not happen here and what we have is we have a local management team who doesn't want to escalate harassment so when they see the word nigger written on the wall they rip it up and throw it away and don't tell anybody when an employee says my life has been threatened at an airport and the environment we live in today where there's death threats at an airport we cannot minimize this because it involves African Americans as opposed to anybody that made these type of death threats at an airport everyone would be coming down outside agencies as well as corporate security as well as the employee service center what we have here is we have an issue with race harassment as pointed out by your honor we have a local management force that doesn't want to escalate they want to say thanks well that's what kind of hangs me up you know I think that Marklift and all those cases seems to me correctly frame the legal question about whether the employer's response is reasonably calculated to bring an end to the harassment but not all harassment is the same and it seems to me racial death threats may not require the same kind of response that some less more severe less severe threats this was a death threat against an identifiable human being of a racial classification and I don't know how it gets any more serious than that as far as I'm concerned you call out the Calvary when that kind of thing happens and when you don't call out the Calvary 20 other African Americans get the same death threat precisely and that's what  I don't understand how it cannot be a jury question as opposed to a question that can be resolved as a matter of law if if the word reasonable means anything it usually means except at the polar extremes that it's a factual question and I'm having difficulty in this case seeing how if I happen to think I'm not saying I do but if I happen to think that United's response wasn't reasonably calculated here that somehow I'm an unreasonable judge that's what that's what it amounts to I can't think that you've just acknowledged to me a few minutes ago that as a matter of law their response to the second thing that was in in the following fall was reasonable there's no jury question there so there are some responses that are reasonable even though reasonableness and intent and everything are usually jury questions but sometimes they're not that is correct your honor I would agree with that statement but again what we have to look at are the facts there's facts that are specific to this particular case some instances you have local human resources you have a complaint procedure that is there locally that can handle these matters but because Dulles did not have a local human resources it was very important that these supervisors the director of Dulles as well as the base manager communicate these issues up to the chain of command when Ms. Zahner was investigating these issues she said I was not aware of the prostitution allegations no one told me about the posting in the break room referring to African Americans as niggers and if I would have known that I would have made a different decision about there was no policy violation so we have limited information from the individual tasked to investigate this the individual who found that the death threats did not violate any United policy we have a complete failure of understanding if we have a human resources official look at a death threat with an African American hanging from a tree and say that doesn't violate any of our policies here at United because it's anonymous let me ask you this what is this we have exactly exactly what happened in the first instance happened again yes and there is never another death threat and your honor do you have a cause of action there is no further death threats and the cameras are put in place no no no the first incident just exactly the same facts as we have the whole back and forth different United people reporting and posting the sign in March and I think that's the we never have another threat that's the factual underpinning that the district court builds upon to rule I'm just asking you I think we still have a cause of action because we're going to say the events preceding the posting of in the mailbox put United on notice that action should have been taken but how could how could any court hold in a jury question whether the response had been effective or not if it stopped the discrimination if it stopped the harassment I'm sorry but I thought you asked me if after the posting was put in the mailbox after the posting is put in the mailbox and United does all these meetings and it goes they talk to the police and she talks to the police and they finally post that notice United does nothing about this discrimination and United doesn't tolerate it and there's never another incident our focus is the assuming it never happened again it did not happen in October we would still believe there's a cause of action for a hostile work environment because we believe actions could have been taken before the death threats were put in the mailbox which could have stopped it and that is correct but a key nuance here your honor is local management Ms. Panos and Ms. Robinson Palmer did know about it the individuals who were tasked with investigating these issues did know about these issues and they could have taken steps to stop the harassment thank you thank you thank you both for coming in the 4th circuit we have a customer coming down and saying hello to the lawyers after the argument we'd like to do that and then we'll go directly to our next case
judges: Diana Gribbon Motz, Roger L. Gregory, Andre M. Davis